[No. 68152-4-I. Division One. December 3, 2012.]

FAIRWAY ESTATES ASSOCIATION OF APARTMENT OWNERS, *Appellant*, v. UNKNOWN HEIRS AND DEVISEES OF ROBERT D. YOUNG ET AL., *Defendants*, SAND POINT COUNTRY CLUB, INC., *Respondent*.

*Michael A. Padilla*, for appellant.

*Robert G. Casey* (of *Eisenhower Carlson PLLC*), for respondent.

¶1 DWYER, J. — The Fairway Estates Association of Apartment Owners—a condominium association comprised entirely of persons owning their apartment units by way of leasehold—appeals from the trial court's determination that its statutory lien for unpaid assessments attaches only to a member's leasehold interest in that unit. The Associa-

tion asserts that, because both the relevant statutory scheme and the condominium declaration stipulate that the Association has a lien on a "unit" for unpaid assessments, this lien must be construed to also attach to the lessor's underlying fee simple interest.

¶2 However, the Horizontal Property Regimes Act (HPRA), chapter 64.32 RCW, expressly permits an apartment unit owner to "own" his or her apartment by way of leasehold. Here, the condominium declaration designated apartment units for leasehold ownership, created an association of apartment owners comprised solely of leasehold owners, and expressly excluded the lessor's underlying fee ownership interest in the apartment units from its definition of an "apartment owner." In such circumstances, because it is clear that the declaration intends that the "unit" designated for separate ownership is a leasehold unit, the trial court did not err by determining that the Association's lien attaches only to this leasehold interest. Accordingly, we affirm.

I

¶3 Sand Point Country Club Inc. is the fee owner of real property located in Seattle, Washington. In 1973, Sand Point leased this property to Fairway Estates, a limited partnership, for the purpose of developing the property through the construction of apartment buildings and other improvements. Pursuant to the lease, Sand Point was to be paid rent periodically with Fairway Estates accepting responsibility for all costs and expenses such as taxes, insurance, repairs, and maintenance. This lease was thereafter amended to encompass an 88-year term, expiring in March 2061.

¶4 In November 1974, following the construction of 84 apartment units (located within three buildings designated as "Buildings A, B, and C"), Sand Point and Fairway Estates determined that these apartments would best be marketed

as individual condominium units. Accordingly, Sand Point and Fairway Estates, acting in concert as "Declarant," entered into and caused to be recorded a condominium declaration, submitting "Buildings A, B & C, together with all appurtenances thereto, to the provisions of the Horizontal Property Regimes Act." The declaration states:

> Declarant desires to establish by this Declaration a plan [(1)] for the ownership of units of the area and space contained in Buildings A, B & C, as provided herein, [(2)] for the co-ownership by the owners of such units of an individual interest in the property which is subject to this Declaration . . . and [(3)] to provide for the rights and obligations of the owners with respect to the property.

The declaration further provides that "[a]ll of the owners of apartment units submitted to this Declaration shall constitute the Association of Apartment Owners as provided by [the HPRA]." Although the term "owner" is not defined in the declaration, the declaration notes that "Declarant desires and intends to assign leasehold interests to apartment units in Buildings A, B & C."

¶5 An amendment to the original lease was recorded on the same day. The modified lease converted the subject of the lease from traditional real property to condominium estates, converted Fairway Estates' interest from a lessee's interest in real property to a lessee's interest in condominium units, and contemplated that Fairway Estates would incrementally transfer its leasehold interest in the condominium by way of specific assignments of the apartment units to individual purchasers. The lease was "subordinated and made inferior to all of the condominium estates" established by the declaration.

¶6 Following the assignment of Fairway Estates' leasehold interests in apartment units to individual purchasers, a condominium association was created under the terms of the declaration. The "Fairway Estates Association of Apartment Owners" was duly organized as a nonprofit corporation pursuant to the HPRA for the operation of the condo-

minium estates. Pursuant to the declaration, the Association was (and is) comprised of the assignees of Fairway Estates' leasehold interest in the condominium. Sand Point, which is not such an assignee, is not a member of the Association.

¶7 In 1996, the Association's board of directors submitted an amended condominium declaration to its members for approval. As specified in the original declaration, the assignees of Fairway Estates' leasehold interest (the apartment owners) were given notice of the proposed amendment. The necessary percentage of association members approved the amended declaration and the president and secretary of the Association thereafter certified that the amended declaration "restates, supersedes, replaces and amends, in its entirety, the Original Declaration previously recorded for the Condominium."[1]

¶8 The amended declaration varies from the original declaration in several respects. Of significance here, it contains a substantial "definitions" section, assigning specific meaning to terms left undefined in the original declaration. "Apartment Unit" is defined in the amended declaration to mean "an 'Apartment' or 'Unit' . . . which is a physical portion of the Condominium designated for separate ownership." "Owner" or "Unit Owner" is defined to mean "the person or persons owning a leasehold interest in a Unit." The amended declaration further notes that "[w]henever the word 'Owner' or 'Owners' is used, it shall mean the assignee(s) of [Fairway Estates'] leasehold interest" and that the words " 'sale', 'sold', 'convey', 'rent', 'lease', or any other words . . . giving rise to the inference of a transfer of an interest in [a] Unit(s) or an estate(s) in the same shall mean the assignment of lessee's interest under the Underlying Lease." Finally, the declaration reiterates that only "Owners"—defined as the assignees of Fairway Estates' leasehold interest—enjoy membership in the Association.

---

[1] Sand Point was not a signatory to the amended declaration.

■ ¶9 In March 2011, the Association brought an action to foreclose a lien for unpaid assessments.[2] The owners of the unit were Robert and ZelIa Young. Both were deceased at the time that the action was brought and no assessments had been paid since October 1, 2006. Pursuant to the condominium declaration, the assessments were the "separate or joint and several personal debts and obligations" of the Youngs. In addition, the declaration stipulates that the "[t]he amount of any Assessment . . . assessed to the Owner of any Apartment Unit or to any Apartment Unit . . . shall be a lien upon such Apartment Unit." In its complaint for foreclosure, the Association contended that this lien attached, not merely to the Youngs' leasehold interest in the condominium, but also to Sand Point's underlying fee simple ownership interest in the unit.

¶10 Both Sand Point and the Association moved for summary judgment on this issue. The trial court denied the Association's motion and granted Sand Point's motion, ruling that "Sand Point Country Club's fee ownership interest in [the] individual condominium units . . . is senior to the lien of [the Association], and is not subject to elimination in any lien foreclosure by the Association."[3]

¶11 The Association appeals.

II

¶12 The Association first asserts that the trial court erred by determining that the Association's lien for assessments attached only to the Youngs' leasehold interest in the apartment unit. We disagree.

---

[2] RCW 64.32.200(1) stipulates that the condominium declaration may provide for the collection of all sums assessed by the association of apartment owners for common expenses. Here, the declaration so provides.

[3] The Association moved for reconsideration. The trial court granted this motion in part and entered a judgment and decree of foreclosure in the amount of $65,102.45, awarded in rem against the Youngs' leasehold interest in the unit. The court specified that this order did not modify its prior ruling that Sand Point's fee simple interest was not subject to the Association's lien.

¶13 The trial court's summary judgment order involved the interpretation of a statute and a condominium declaration. We review a summary judgment order de novo, engaging in the same inquiry as the trial court. *Lake v. Woodcreek Homeowners Ass'n*, 169 Wn.2d 516, 526, 243 P.3d 1283 (2010). Summary judgment is proper if, after viewing all facts and reasonable inferences in the light most favorable to the nonmoving party, there are no genuine issues as to any material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). Statutory interpretation is a question of law that we review de novo. *Quality Food Ctrs. v. Mary Jewell T, LLC*, 134 Wn. App. 814, 817, 142 P.3d 206 (2006). "A condominium declaration is like a deed, the review of which is a mixed question of law and fact." *Lake*, 169 Wn.2d at 526. The factual issue is the declarant's intent, which we discern from the face of the declaration; the declaration's legal consequences are questions of law, which we review de novo. *Lake*, 169 Wn.2d at 526.

¶14 Here, the Association relies upon the condominium declaration, the HPRA, and the Condominium Act (chapter 64.34 RCW)[4] for the proposition that Sand Point's fee simple interest in the Youngs' condominium unit is subject to the Association's lien. RCW 64.34.364(1) stipulates that a condominium association "has a lien on a unit for any unpaid assessments levied against a unit from the time the assessment is due."[5] Mirroring this statutory language, the condominium declaration stipulates that

---

[4] Although the Condominium Act generally applies only to condominiums created after July 1, 1990, the act specifies that RCW 64.34.364 (the provision concerning a condominium association's lien for assessments), as well as the definitions necessary to construe that provision, apply to condominiums created before that time with respect to events and circumstances occurring after July 1, 1990. RCW 64.34.010. Here, given that the assessments at issue in this case were levied well after July 1, 1990, the parties agree that RCW 64.34.364 is applicable.

[5] The HPRA contains a substantially similar provision: "All sums assessed by the association of apartment owners but unpaid for the share of the common expenses chargeable to any apartment shall constitute a lien on such apartment prior to all other liens." RCW 64.32.200(2).

"[t]he amount of any Assessment . . . assessed to the Owner of any Apartment Unit or to any Apartment Unit . . . shall be a lien upon such Apartment Unit." "Apartment Unit" is defined in the declaration to mean an " 'Apartment' or 'Unit' . . . which is a physical portion of the Condominium designated for separate ownership."

¶15 The Association asserts that the "unit" that is subject to the Association's lien must be determined by reference to the ownership interest of the original declarant. As the Association correctly points out, the ownership interests of both Sand Point and Fairway Estates were submitted to the provisions of the HPRA. Accordingly, because Sand Point held a fee simple interest in the land, the Association asserts that the units created by the declaration are units owned in fee simple by Sand Point.[6] The Association characterizes the assignees of Fairway Estates' leasehold interest as mere "tenants" of Sand Point and not as true "owners" of their units. Because the condominium declaration subjects Sand Point's fee simple interest in the property to the HPRA, the Association asserts that its lien must be construed to attach to that fee simple interest.[7] The Associa-

---

[6] The original declaration noted that it was "recognized that the fee ownership of the condominium units and estates herein established is in [Sand Point]." In the amended declaration, however, this section was modified to read: "it being recognized that the fee ownership of the Land upon which the Condominium is located is owned by [Sand Point], subject to the terms of the Underlying Lease."

[7] Sand Point devotes a large portion of its briefing to a discussion of the inapplicability of RCW 64.34.220, a provision of the Condominium Act pertaining to "ground lease" condominiums. The Association, however, concedes that this provision, which is applicable only to condominiums created prior to July 1, 1990, does not apply in this case. Instead, the Association's discussion of ground lease condominiums—which arise when a *lessee* of real property subjects his or her leasehold interest to the provisions of the Condominium Act—is included to contrast the creation of a ground lease condominium under RCW 64.34.220 with the situation at issue here, in which both lessor and lessee acted in concert to submit all their ownership interests to the provisions of the HPRA. Nevertheless, Sand Point is correct that, because RCW 64.34.220 is inapplicable, it is irrelevant that Sand Point's actions as declarant would not result in a ground lease condominium pursuant to this provision. Rather, the legal effect of Sand Point's intentions must be determined without reference to RCW 64.34.220.

tion contends that the plain meaning of the statute leaves room for no other interpretation.[8]

¶16 The Association's interpretation, however, is not the only reasonable one. A statute is ambiguous when it is susceptible to two or more reasonable interpretations. *State v. Gonzalez*, 168 Wn.2d 256, 263, 226 P.3d 131 (2010). Here, although RCW 64.34.364(1) stipulates that a condominium association "has a lien on a unit," the HPRA expressly states that an apartment unit owner may include "persons owning an apartment . . . by way of leasehold." RCW 64.32.010(2). Moreover, "[e]ach apartment owner shall be entitled to the exclusive ownership . . . of his or her apartment." RCW 64.32.040. When read in conjunction, these statutory provisions make clear that the HPRA contemplates situations in which an apartment unit is defined to exclude the underlying fee simple interest of a lessor—after all, an apartment owner who owns his or her unit by way of leasehold, as is permitted by RCW 64.32.010(2), could not have "exclusive" ownership of that apartment unit if the term "unit" was defined to necessarily include the lessor's underlying fee interest. Moreover, under the Condominium Act, the term "unit" is defined to mean "a physical portion of the condominium *designated for separate ownership*." RCW 64.34.020(41) (emphasis added). Accordingly, the "unit" that is subject to a condominium association's lien may reasonably be interpreted to be whatever "unit" is designated for separate ownership by the condominium declaration.

¶17 Here, the condominium declaration contemplates that all apartment units within the condominium be

---

[8] Sand Point is correct that Sand Point's ownership interest in the unit is not subject to RCW 64.34.364(2). This statutory provision concerns the priority of a condominium association's statutory lien with respect to the "liens and encumbrances" of other creditors. As Sand Point correctly points out, its ownership interest is neither a lien nor an encumbrance. However, the Association does not so argue. Instead, as discussed above, it relies upon RCW 64.34.364(1) for the proposition that its lien attaches to the "unit" created by the condominium declaration. The priority of that lien is not pertinent in the context of this case.

owned by way of leasehold. Sand Point and Fairway Estates declared their mutual intent "to assign leasehold interests to apartment units in Buildings A, B & C." The declaration expressly provides that "[w]henever the word 'Owner' or 'Owners' is used, it shall mean the assignee(s) of [Fairway Estates'] leasehold interest under the Underlying Lease in the Unit(s)." Sand Point's fee simple ownership interest in the individual apartment units is excluded from the declaration's definition of an "owner" of an individual apartment unit.

¶18 Furthermore, as noted above, the declaration specifies that an "Apartment Unit" means an " 'Apartment' or 'Unit' . . . [,] which is a physical portion of the Condominium designated for separate ownership." In this case, only Fairway Estates' leasehold interest in the condominium estate was designated for separate ownership. The declaration specifies that it is the declarant's intent to assign only the leasehold interest of Fairway Estates to individual purchasers; Sand Point's fee simple interest is not so designated in the declaration.

¶19 Moreover, only the assignees of Fairway Estates' leasehold interest are entitled to membership within the condominium association created by the declaration. Sand Point possesses none of the rights and is subject to none of the obligations of such voting owners. Sand Point is not obliged to maintain or to repair the premises, or to pay any assessments levied against a unit owner by the Association.

¶20 Finally, the condominium declaration makes clear that an apartment owner's leasehold interest in the unit constitutes "title to the Apartment Unit." The declaration explains that an apartment owner's membership in the Association cannot be "transferred, pledged, hypothecated, conveyed or alienated except upon the transfer of *title to the Apartment Unit* and then only to the transferee of title to the Apartment Unit." (Emphasis added.) Accordingly, when the condominium scheme is viewed as a whole, it is clear that the intended unit of ownership—and thus the "unit"

subject to the Association's lien—is limited to a leasehold interest in the apartment unit and does not include Sand Point's underlying fee simple interest in the unit.

¶21 Nevertheless, the Association asserts that the assignees of the Fairway Estates' leasehold interest are not the true "owners" of their units. The Association contends that the declaration's use of the term "owner" to describe such persons is a matter of semantics and that the declaration "could just as well have labeled them 'Lease Assignee' or 'Tenant' or anything else" without legal significance. However, the words of the declaration matter. Of importance here, RCW 64.32.010(4) provides that the condominium association created by a declaration must be comprised of "apartment owners." The declaration likewise stipulates that only an apartment unit "owner"—defined by the declaration as an assignee of Fairway Estates' leasehold interest—is qualified for membership in the Association. Moreover, only an "association of apartment owners" may levy assessments against an apartment owner's unit. RCW 64.32.200(1).

¶22 Here, it is undisputed that Sand Point is not a member of the Association. Accordingly, if the Association were correct that Sand Point is the "owner" of the Youngs' apartment unit, then it would also be true that the Association is improperly constituted under both the HPRA and the declaration. If the members of the Association are mere "tenants" or "lease assignees," then the Association itself is nothing more than a tenants' association. However, the Association's power to levy assessments against a unit arises by virtue of its status as a condominium association. RCW 64.32.200(1). Thus, if the Association is not such a condominium association, it had no power to levy the assessments at issue in this case. Nor does the statute grant a "lien on a unit" to a tenants' association—such a lien may be held only by a properly constituted "association of apartment owners." RCW 64.32.200(2).

¶23 Accordingly, because the condominium declaration stipulates that the association of apartment owners is to be

comprised of persons owning their units by way of leasehold, the Association's lien for unpaid expenses must be construed as attaching only to the leasehold interests of such persons.

¶24 Despite the intent of the condominium declaration, the Association nevertheless asserts that "there is no provision Sand Point could have drafted" that would limit the Association's lien for unpaid assessments from attaching only to the leasehold interest of the Youngs. However, as explained above, the language of the statute does not preclude such an arrangement. Moreover, the Association's alternative interpretation—whereby the "unit" subject to a statutory lien is determined solely by reference to the declarant's ownership interest in the land submitted to the HPRA—leads to absurd and unjust results. Where a statute is ambiguous, a court may "employ various rules for discerning the legislature's intent for the statute as a whole." *Summerhill Vill. Homeowners Ass'n v. Roughley*, 166 Wn. App. 625, 631, 289 P.3d 645 (2012). One of these rules is that "[a] statute must be read to avoid injustice or an absurd result." *Newby v. Gerry*, 38 Wn. App. 812, 814, 690 P.2d 603 (1984).

¶25 In this case, if—despite the intent of the condominium declaration—the statute were interpreted to require that the Association's lien attach to Sand Point's fee simple interest in the unit, Sand Point could be divested of its property through no fault of its own. Only leasehold owners of the apartment units are personally liable for the Association's assessments. No provision of the declaration provides for notice to Sand Point regarding the imposition of assessments, the default in the payment of such assessments, or the process for the collection of unpaid assessments. Accordingly, under the Association's proposed interpretation, Sand Point would have no opportunity to protect its interests prior to a foreclosure action. Indeed, any failure by a leasehold owner to pay the Association's assess-

ments would subject Sand Point's fee ownership interest to elimination.[9]

¶26 The legislature cannot have intended such a result. Significantly, the Association's interests are fully protected by a lien attaching to the leasehold owner's interest in the apartment unit. Following the foreclosure of such a lien, the leasehold unit would be sold at a sheriff's sale. RCW 61.12-.060. The purchaser of such a unit would have the same ownership interest in the unit as all other members of the Association. The Association's proposed interpretation—whereby a blameless fee owner could be divested of its property—offends fundamental notions of fairness. Because an ambiguous statute should not be read to produce injustice, *Newby*, 38 Wn. App. at 814, we must reject this interpretation of the statute.

¶27 For all of these reasons, where a condominium declaration is clear that individual units are designated for separate ownership by way of leasehold, the condominium association's statutory lien on a unit for unpaid assessments attaches solely to the owner's leasehold interest in that unit. The trial court did not err by so ruling.

## III

¶28 The Association next contends that the trial court erred by awarding attorney fees and costs to Sand Point. We disagree.

¶29 Whether a party is entitled to attorney fees is an issue of law that we review de novo. *Ethridge v.*

---

[9] As the Association correctly points out, a debtor need not always own the collateral that is used to secure a debt. *Seattle-First Nat'l Bank v. Hart*, 19 Wn. App. 71, 573 P.2d 827 (1978). "If the landlord joins the tenant in granting the mortgage, then the landlord has mortgaged his fee simple estate to secure the debt of a third person." 18 WILLIAM B. STOEBUCK & JOHN W. WEAVER, WASHINGTON PRACTICE: REAL ESTATE: TRANSACTIONS § 17.14, at 297 (2d ed. 2004). In this case, however, Sand Point did not "join" the leasehold owner in granting a security interest to the Association—as discussed above, the intent of the condominium declaration was to grant a lien in apartment units owned by way of leasehold. Accordingly, a security interest attaches to Sand Point's fee interest in the unit, if at all, only by way of statute.

*Hwang*, 105 Wn. App. 447, 460, 20 P.3d 958 (2001). We review the reasonableness of the fees awarded for abuse of discretion. *Ethridge*, 105 Wn. App. at 460.

 ¶30 "In Washington, attorney fees may be awarded only when authorized by a private agreement, a statute, or a recognized ground of equity." *Labriola v. Pollard Grp., Inc.*, 152 Wn.2d 828, 839, 100 P.3d 791 (2004). One such " 'well recognized principle of equity' " is the principle of mutuality of remedy. *Kaintz v. PLG, Inc.*, 147 Wn. App. 782, 789, 197 P.3d 710 (2008) (quoting *Mt. Hood Beverage Co. v. Constellation Brands, Inc.*, 149 Wn.2d 98, 121, 63 P.3d 779 (2003)). Pursuant to this principle, where a party has successfully argued that a statute is invalid (thus rendering the statute's attorney fee provision without force), that party is nevertheless entitled to an award of attorney fees if such fees would have been awarded to the opposing party had the statute been deemed valid. *Kaintz*, 147 Wn. App. at 789 (citing *Mt. Hood Beverage Co.*, 149 Wn.2d at 121-22). This same equitable principle underlies the legislature's enactment of RCW 4.84.330, which requires that a unilateral attorney fee provision contained in a contract be applied on a reciprocal basis. *Yuan v. Chow*, 96 Wn. App. 909, 918, 982 P.2d 647 (1999).

¶31 Here, Sand Point has successfully argued that the Association's statutory lien does not attach to its fee interest in the Youngs' condominium unit. Accordingly, as in *Mt. Hood*, the statutory fee provision set forth by RCW 64.34.364(14) is inapplicable. However, if the Association had prevailed on this claim, the Association would have been "entitled to recover any costs and reasonable attorneys' fees incurred in connection with the collection of delinquent assessments." RCW 64.34.364(14). In these circumstances, the principle of mutuality of remedy applies. *See Kaintz*, 147 Wn. App. at 789. Because the Association would have been entitled to attorney fees had it prevailed on this issue, pursuant to the equitable principle of mutuality of remedy, Sand Point is entitled to an award of fees as the prevailing party.

¶32 Moreover, the amount awarded as attorney fees was not unreasonable. Absent a manifest abuse of discretion, we will not disturb an award of attorney fees. *Seattle-First Nat'l Bank v. Wash. Ins. Guar. Ass'n*, 94 Wn. App. 744, 761-62, 972 P.2d 1282 (1999). Here, an affidavit of Sand Point's attorney described the work performed, the total number of hours expended, and the billing rate of each lawyer associated with the case. Applying the "lodestar" method set forth in *Bowers v. Transamerica Title Ins. Co.*, 100 Wn.2d 581, 594, 675 P.2d 193 (1983), the trial court ordered that Sand Point be awarded attorney fees in the amount of $24,196.[10]

¶33 The trial court did not abuse its discretion by so ruling. Although the Association argues on appeal that block billing and duplicative fees should have precluded Sand Point from recovering its fees, there is no indication that the trial court's determination of the attorney fee award was unreasonable. Indeed, in this very case, the Association requested and was awarded $32,977.70 in attorney fees, enforceable against the Youngs' leasehold interest in the apartment unit. There was no trial court error.

¶34 Sand Point requests an award of attorney fees and costs incurred on appeal. Sand Point is entitled to a reasonable award of fees and costs. Upon a proper application, a commissioner of this court will enter an appropriate award.

¶35 Affirmed.

LEACH, C.J., and SPEARMAN, J., concur.

---

[10] The court also awarded Sand Point's costs of $558.74. The Association does not assign error to this award.