# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| BEN GERVAIS, | No. 55456-9-II |
| Appellant | |
| v. | |
| CHRISTOPHER HAMILTON and JANE DOE HAMILTON, husband and wife, and HG HOLDINGS LLC, a Washington limited liability company, | UNPUBLISHED OPINION |
| Respondents, | |
| BEN GERVAIS, | |
| Appellant. | |
| v. | |
| AL SHOTT and JANE DOE SHOTT, husband and wife, and HERITAGE BANK, a federally regulated banking institution, | |
| Respondents. | |

VELJACIC, J. — Ben Gervais appeals the trial court's order granting attorney fees and costs to Christopher Hamilton, Heritage Bank, and the bank's vice president, Al Shott (Heritage and Shott collectively referred to as "Heritage Bank"). Gervais argues that the trial court did not have a legal basis to award attorney fees and costs to Hamilton and Heritage Bank because neither he nor they were parties to the lease agreement at issue. Hamilton and Heritage Bank request attorney fees and costs on appeal.

We agree with Gervais and hold that the trial court erred in granting attorney fees and costs to Hamilton and Heritage Bank and reverse the trial court's order. We also deny Hamilton's and Heritage Bank's requests for attorney fees and costs on appeal.

FACTS

I.      FACTUAL BACKGROUND[1]

A.      Hamilton and Gervais's Business Relationship

In 2008, Gervais and Hamilton formed G&H Enterprises, Inc. (G&H) in order to operate Rainbow International, a business which was previously owned and operated by Gervais and his former spouse. At the time G&H was created, Hamilton owned 51 percent of the shares and Gervais owned 49 percent.

In 2012, Gervais and Hamilton formed HG Holdings, LLC (HG), where they were equal members. Under HG's operating agreement, Hamilton is the managing member and is therefore in charge of the company's business needs. Despite being a limited liability company, Gervais and Hamilton ran HG as a partnership, similar to their other business ventures.

HG held title in certain real property located on Fawcett Avenue. In late 2013, through HG, Gervais and Hamilton sold the Fawcett property.

B.      The Acquisition of the South Adams Property and Lease Agreement Pertaining Thereto

In November 2013, after selling the Fawcett property, Gervais and Hamilton identified certain commercial real estate located at 6035 South Adams Street (South Adams property) in Tacoma, which they believed would suit the needs of Rainbow International (operated by G&H). Through HG, Gervais and Hamilton purchased the South Adams property for $725,000. HG

---

[1] The substantive facts are drawn from the trial court's unchallenged findings of fact, which are verities on appeal. *Seven Hills, LLC, v. Chelan County*, 198 Wn.2d 371, 384, 495 P.3d 778 (2021).

2

rented the South Adams property to G&H for $5,000 per month. This tenancy had no written lease.

In May 2016, Gervais and Hamilton decided to separate most of their joint business interests, except for the ownership of the South Adams property. Hamilton redeemed Gervais's stock ownership in G&H and bought out his interest in Rainbow International. In exchange, Gervais and Hamilton agreed on the terms of a lease agreement between G&H and HG, which provided G&H with an option to purchase the South Adams property during the term of the lease. The decision to have HG enter into the lease with the purchase option had the effect of putting G&H and Hamilton on both sides of a transaction if G&H elected to exercise the option, per HG's operating agreement.

The lease agreement included a provision that set the valuation method for the South Adams property in the event G&H exercised its purchase option. Paragraph 4(a) of the lease provided that,

> 4. **Option to Purchase:** Landlord hereby grants Tenant an exclusive option to purchase the premises at any time during the lease term on the following terms and conditions:
>
> (a) Option Price: The purchase price for the premises upon exercise of the option shall be determined by MAI appraisal. The parties shall attempt to agree on a single MAI appraiser. If, after 30 days following the exercise of the option by Tenant, the parties are unable to agree on the selection of an appraiser, each party shall proceed with their own MAI appraiser and the purchase price shall be an average of the two appraisals. If one appraiser is agreed upon the parties shall each pay ½ of the cost of the appraisal; if two appraisals are done each party shall pay the cost of their own appraisal.

Clerk's Papers (CP) at 38. This provision was drafted so that there would be a fair way to value the South Adams property.

The only parties to the lease agreement were the landlord, HG, and the tenant, G&H. Hamilton signed the lease in his capacity as the managing member of HG and president of G&H. Gervais did not sign the lease.

The lease agreement also contained an attorney fees provision. That provision reads,

> 20. **Attorneys' Fees:** Should either party bring any action or suit to enforce any of the provisions of this lease, such party shall, upon prevailing in such action or suit, be entitled, in addition to the relief therein granted, to such sum as the court may adjudge reasonable as attorneys' fees at both the trial and appellate court levels.

CP at 41.

C.      The Sale of the South Adams Property

By late 2017 and early 2018, G&H and Rainbow International entered into a new fire restoration market which increased G&H's need for space to conduct business. In April 2018, Hamilton contacted Gervais about his interest in purchasing the property or having G&H exercise its purchase option in the lease agreement. Gervais stated that he was not interested in selling the South Adams property.

On or about June 4, invoking the language of the lease, Hamilton contacted Gervais about obtaining a Member Appraisal Institute (MAI) appraiser, blindly selected from Heritage Bank's list, to establish the purchase price of the South Adams property. That same day, Heritage Bank provided Hamilton with a pricing list of the blind bids submitted to conduct the appraisal. Hamilton selected the lowest bidder. On that basis, Heritage Bank sent an engagement letter to Patrick Johnson of Montro & Johnson, requesting him to conduct an appraisal of the South Adams property.

On June 12, Gervais responded to Hamilton, stating that he believed "it would be best if we both got appraisals done on the building so we are not just held to one." CP at 57.

4

On or about June 14, Gervais contacted his friend, Scott Krause, a business broker primarily involved in the sale of marijuana businesses under Initiative 502. Krause advised Gervais that the South Adams property was worth between $1,100,000 and $1,300,000.

On July 3, Hamilton received a copy of Johnson's appraisal from Heritage Bank, which valued the South Adams property at $900,000. Although the Johnson appraisal might have been on the low end of value, it was based on a reasoned assessment of the market and did not reveal any evidence of bias.

Heritage Bank then began preparing documents for a loan in the amount of $700,000, pursuant to Hamilton's request. Heritage Bank was aware that Hamilton was utilizing the Johnston appraisal to exercise the purchase option under the lease. It did not participate in, advocate for Hamilton, or otherwise interfere with any negotiation between Gervais and Hamilton.

Gervais believed he could oppose the sale of the South Adams property and had a right to be included in the selection of appraisers to value the property. However, on August 16, Gervais learned that Hamilton did not need his permission or involvement to sell the South Adams property. Hamilton did not realize that he could proceed without Gervais's consent until mid-July 2018.

On August 20, Gervais invited Hamilton over to his home to discuss the proposed sale of the South Adams property. Gervais told Hamilton that he believed the property was worth $1,200,000. Gervais then agreed to have an MAI appraiser value the property.

Gervais then contacted Mark Percival to appraise the South Adams property. Percival was not an MAI appraiser.

On August 21, Percival met with Gervais and Hamilton at the South Adams property. CP 63. At this meeting, Percival made a number of statements that caused Hamilton to believe that

he approached the appraisal from a biased standpoint. Despite Hamilton's concerns, Gervais insisted on having Percival as the appraiser he trusted to value the South Adams property.

On August 21 and 22, Hamilton signed the purchase and sale agreement and sent a letter to Gervais formally exercising the purchase option in the lease agreement based on the Johnson appraised value of $900,000. The transaction closed on August 30 and Gervais received all net proceeds.

II.     PROCEDURAL HISTORY

On April 23, 2019, Gervais filed an amended complaint against Hamilton and HG. Relevant here, Gervais alleged that Hamilton breached certain fiduciary duties by selling the South Adams property under its fair market value from HG to G&H. Gervais also alleged that Hamilton acted with gross negligence or engaged in willful misconduct under former RCW 25.15.155 (1994), which governs the obligations of Hamilton as the managing member of HG. Gervais also requested attorney fees and costs.

On June 30, 2020, Gervais filed a separate action against Heritage Bank. Gervais alleged that Heritage Bank intentionally interfered with his "contractual rights and business expectancy" by agreeing to and authorizing the Johnson appraisal. CP at 657. Gervais also alleged that Heritage Bank "engaged in a civil conspiracy by agreeing and acting in concert to accomplish an unlawful purpose, the sale of the [South Adams] property in violation of the [purchase option in the lease agreement] at less than fair market value." CP at 658. Gervais further contended that Heritage Bank engaged in unfair and deceptive practices with respect to the Johnson appraisal in violation of Washington's Consumer Protection Act (CPA). Gervais claimed $200,000 in damages, which included the legal fees incurred in litigation with Hamilton and caused by Heritage Bank.

On August 21, the trial court consolidated the above actions pursuant to CR 42. The consolidated matter proceeded to a bench trial.

On January 8, 2021, the trial court entered findings of fact (discussed above) and conclusions of law. Relevant here, the court entered the following conclusions of law that dismissed all of Gervais's claims:

> 3. . . . Hamilton did not breach any fiduciary duty with respect to HG or [] Gervais.
>
> 4. [] Gervais was a participant in the creation of the lease.
>
> . . . .
>
> 9. [] Heritage Bank did not otherwise commit a per se violation of RCW 19.86, the [CPA]. [] Heritage Bank [is] therefore entitled to a Judgment of Dismissal of any and all claims alleging a violation of RCW 19.86, the [CPA].
>
> 10. [] Heritage Bank did not engage in or commit any tortious interference with a contract, lease or prospective economic advantage of [] Gervais, [and is] therefore entitled to a Judgement of Dismissal of that cause of action.
>
> 11. [] Heritage Bank did not engage in a civil conspiracy with [] Hamilton, and [is] therefore entitled to a Judgment of Dismissal of that cause of action.

CP at 67-69. The court expressly declined to conclude that Gervais was an intended third party beneficiary of the lease agreement.

Hamilton moved for attorney fees and costs under RCW 4.84.330 and paragraph 20 of the lease agreement. Hamilton argued that the trial court should award attorney fees and costs because the action arose out of the lease agreement and because the lease agreement was central to the case.

Heritage Bank also moved for attorney fees and costs. Heritage Bank appeared to contend that such an award was proper because the lease was central to the case and because Gervais had requested fees from it under equity.

Gervais argued that the trial court should deny Hamilton's and Heritage Bank's request for attorney fees because neither he nor they were parties to the lease agreement. Gervais also argued that they were not entitled to fees because the action was not on the contract.

On January 22, the trial court entered an order awarding attorney fees and costs to Hamilton and Heritage Bank. The court awarded $108,244.75 to Heritage Bank and $237,891.61 to Hamilton. Gervais appeals.[2]

## ANALYSIS

I.  ATTORNEY FEES BELOW

Gervais argues that the lease agreement does not authorize a reasonable attorney fee award to Hamilton and Heritage Bank because neither he nor they were parties to that agreement. We agree.

Here, paragraph 20 of the lease agreement, in conjunction with RCW 4.84.330 would, in other circumstances, authorize attorney fees to the prevailing parties, here Hamilton and Heritage Bank, because the claims are "on the contract" and the contract provision would be made bilateral

---

[2] Hamilton filed a notice of cross-appeal challenging the trial court's reduction of attorney's fees and costs. However, Hamilton has elected to withdraw his cross-appeal. Accordingly, the only issue before us is whether the trial court had a legal basis to award attorney fees and costs to Hamilton and Heritage Bank, not the amount of those fees.

by application of RCW 4.84.330.[3] *Wachovia SBA Lending, Inc. v. Kraft*, 165 Wn.2d 481, 489, 200 P.3d 683 (2009). But due to the fact that none of the litigants here are parties to the lease agreement, the fee provision therein simply does not apply to them even if it is made bilateral by operation of RCW 4.84.330. *Mut. Sec. Fin. v. Unite*, 68 Wn. App. 636, 642-43, 847 P.2d 4 (1993).

A.      The Trial Court Erred in Awarding Attorney Fees to Hamilton and Heritage Bank

"The general rule in Washington is that attorney fees will not be awarded for costs of litigation unless authorized by contract, statute, or recognized ground of equity." *Durland v. San Juan County*, 182 Wn.2d 55, 76, 340 P.3d 191 (2014). "We review whether there is a legal basis for an award of attorney fees de novo." *Allen v. Dan and Bill's RV Park*, 6 Wn. App. 2d 349, 372, 428 P.3d 376 (2018).

It is well-settled that "a contractual attorney fee provision cannot authorize the recovery of fees from a nonparty." *4518 S. 256th, LLC v. Karen L. Gibbon, P.S.*, 195 Wn. App. 423, 447, 382 P.3d 1 (2016). Division One of this court has stated that "it 'would be both unfair and contrary to law' to enforce [an attorney fee] provision against the nonparty who was a 'stranger[ ]' to that agreement." *Id*. (quoting *Watkins v. Restorative Care Ctr., Inc.*, 66 Wn. App. 178, 195, 831 P.2d

---

[3] RCW 4.84.330 provides that,

> In any action on a contract or lease entered into after September 21, 1977, where such contract or lease specifically provides that attorneys' fees and costs, which are incurred to enforce the provisions of such contract or lease, shall be awarded to one of the parties, the prevailing party, whether he or she is the party specified in the contract or lease or not, shall be entitled to reasonable attorneys' fees in addition to costs and necessary disbursements.
>
> Attorneys' fees provided for by this section shall not be subject to waiver by the parties to any contract or lease which is entered into after September 21, 1977. Any provision in any such contract or lease which provides for a waiver of attorneys' fees is void.
>
> As used in this section "prevailing party" means the party in whose favor final judgment is rendered.

1085 (1992)). "Similarly, because a contract does not confer benefits on nonparties, it would also be contrary to law to award attorney fees to [a nonparty] based on [an agreement they were not a party to]." *Karen L. Gibbon, P.S.*, 195 Wn. App. at 448-49.

Paragraph 20 of the lease agreement provides that, "[s]hould either party bring any action or suit to enforce any of the provisions of this lease, such party shall, upon prevailing in such action or suit, be entitled . . . to such sum as the court may adjudge reasonable as attorneys' fees." CP at 41.

Here, Gervais, Hamilton, and Heritage Bank are not parties to the lease agreement because they did not sign that document, and if they did, they did not do so in their individual capacities.[4] *Karen L. Gibbon, P.S.*, 195 Wn. App. at 446. Rather, the only parties identified in the lease agreement is the landlord, HG, and the tenant, G&H. Because Gervais was not a party to the lease agreement, a court could not enforce the attorney fee provision in that document against him. *Id*. at 447. Similarly, because a contract does not confer benefits on nonparties, a court could not award attorney fees to Hamilton and Heritage Bank based on the lease agreement. *Id*. at 447-48. Accordingly, we reverse the trial court's order awarding attorney fees and costs to Hamilton and Heritage Bank.

C.     Washington Case Law Does Not Support Hamilton's Position

In an apparent argument to extend the law, Hamilton argues that he can enforce the contractual fee provision as a nonparty against another nonparty because a valid contract is not necessary to invoke an attorney fee provision against certain non-parties to the contract. Hamilton relies on several inapposite cases to support this proposition.

---

[4] Heritage Bank correctly concedes that they were not a party to the lease agreement.

First, Hamilton contends that *Herzog Aluminum, Inc. v. General American Window Corp.*, 39 Wn. App. 188, 692 P.2d 867 (1984), and its progeny support the trial court's award of attorney fees. We disagree.

In *Herzog*, the court held that a defendant who successfully defends a breach of contract lawsuit by proving the absence of an enforceable contract is entitled to attorney fees on the purported contract sued upon which would have allowed attorney fees. *Id*. at 189-90, 197. There, the court applied RCW 4.84.330 to render the contractual fee provision at issue bilateral to benefit the prevailing defendant. *Herzog Alum., Inc.*, 39 Wn. App. at 196-97.

Hamilton cites several cases that apply the *Herzog* court's holding. *See Labriola v. Pollard Grp., Inc.*, 152 Wn.2d 828, 839, 100 P.3d 791 (2004) (holding that the employee, as the prevailing party, was entitled to an award of attorney fees under RCW 4.84.330, regardless of whether the contract is invalidated in whole or in part); *Mt. Hood Beverage Co. v. Constellation Brands, Inc.*, 149 Wn.2d 98, 121-22, 63 P.3d 779 (2003) (holding that a party may collect attorney fees pursuant to a statute when that party successfully argues the statute is unconstitutional); *Bogle and Gates, PLLC, v. Holly Mountain Res.*, 108 Wn. App. 557, 563-64, 32 P.3d 1002 (2001) (holding that prevailing defendant in breach of contract and promissory estoppel action was entitled to attorney fees where the fee provision was unilateral); *Park v. Ross Edwards, Inc.*, 41 Wn. App. 833, 838-39, 706 P.2d 1097 (1985) (holding that the defendants who had proved no contract existed were entitled to reasonable attorney fees despite the contract's invalidity and the fee provision being bilateral).

Contrary to Hamilton's contention, *Herzog* and its progeny are not applicable here. It is true that parties to a purported contract cease being parties if the contract is later invalidated by the court. And in those cases the courts nevertheless allowed would-be parties to the contract to

11

collect attorney fees under the fee provisions in the undermined contracts. But those cases are a far cry from what we have here in that neither Hamilton nor Gervais were the contracting parties, validity of the contract aside. Moreover, not only were they not the contracting parties, but the contract here has not been undermined. They are not in the same position as those would-be parties in the cases cited. Accordingly, Hamilton's reliance on those cases fails.[5]

Second, Hamilton contends that, under *Deep Water Brewing, LLC v. Fairway Resources Limited*, 152 Wn. App. 229, 215 P.3d 990 (2009), he (as a nonparty) can recover contractual attorney fees from Gervais (also a nonparty) because the lease agreement was central to Gervais's tort claims. We disagree.

*Deep Water* discussed the award of fees where the recovering party was not a party to a contract. There, Division Three of this court concluded that the trial court properly awarded attorney fees to the Kenagys. *Deep Water*, 152 Wn. App. at 279. The Kenagys bought a restaurant with a lake view from the Ahlquists. *Id*. at 241. The Ahlquists had entered into an easement agreement and a right-of-way agreement with developers to preserve the restaurant's view.[6] *Id*. at 239-40. These latter agreements contained attorney fees provisions. *Id*. at 245-46. The Kenagys sued the developers to enforce the agreements and prevailed. *Id*. at 242-44. Division Three of this

---

[5] Hamilton's position is also inconsistent with the general law of business entities. As discussed above, the parties to this contract were business entities with statutorily-created liability limitations. One of the fundamental purposes of these business entities is to insulate individuals from risking personal assets from liability for business debts and obligations. Absent a reason to disregard these business structures (and no party argues there are facts to support disregarding the corporate form), the limitation of personal liability enjoyed by both Hamilton and Gervais also functions to prevent their recovery of fees under the lease as surrogates for the business entities.

[6] On this point, Hamilton contends that the fee provision in the right of way and easement agreement required Jack Johnson, the sole shareholder of the development company in *Deep Water*, to pay attorney fees despite his non-party status. Hamilton is mistaken. The facts of that case show that Johnson was a party to that agreement because he signed it both individually and in his capacity as president of the development company. *Deep Water*, 152 Wn. App. at 240.

court explained that the Kenagys were not third party beneficiaries to the agreements "but nonetheless [could] enforce the agreements (with attorney fees provisions) as running covenants protecting the view from their restaurant." *Id*. at 278.

But in *Deep Water*, because the covenants ran with the land, the successor owner held the exact rights to the covenant as the previous owner. The case is distinguishable on this basis alone. Gervais and Hamilton are not successors in interest. Rather, they are simply non-parties to the contract. Accordingly, Hamilton's reliance on *Deep Water* is unavailing.

Third, Hamilton argues that he can enforce the contractual fee provision against Gervais because neither he nor Gervais "was a stranger to the lease that they created." Br. of Resp't Hamilton at 44. Hamilton relies on *Columbia State Bank v. Invicta Law Group, PLLC*, 199 Wn. App. 306, 402 P.3d 330 (2017), to support this argument. We disagree.

In *Columbia State Bank*, Division One of this court affirmed an award of contractual attorney fees against a non-signing third party based on a theory of successor liability. 199 Wn. App. at 334-35. There, the court reasoned that there is no fundamental difference between successor liability for judgment on an unpaid promissory note and successor liability for attorney fees. *Id*. at 335.

Hamilton's reliance on *Columbia State Bank* is inapposite because neither he nor Gervais are successors to G&H or HG. Absent successor liability or third-party beneficiary status (which the trial court expressly declined to find and Hamilton does not dispute on appeal), there is no authority to award contractual attorney fees against a non-signing third party. Accordingly, we hold that Hamilton's reliance on case law fails.

13

D.      The Doctrine of Mutuality of Remedy Does Not Apply Under These Circumstances

Next, Hamilton contends that the equitable doctrine of mutuality of remedy supports the trial court's attorney fee award. Heritage Bank contends that the attorney fee award was proper based on an extension of the doctrine to situations where: (1) the plaintiff seeks to recover fees pursuant to an equitable indemnity theory, (2) the defendant successfully defends the claim, and (3) the plaintiff fails to argue that they did not cause the defendant's fees.

The crux of Hamilton and Heritage Bank's argument is the notion that the trial court did not err in awarding them attorney fees because Gervais had sought to collect attorney fees from them under the lease and in equity. We disagree.

Mutuality of remedy is a "'well recognized principle of equity'" in Washington. *Kaintz v. PLG, Inc.*, 147 Wn. App. 782, 789,197 P.3d 710 (2008) (quoting *Mt. Hood Beverage Co.*, 149 Wn.2d at 121). The doctrine provides that if one party would be entitled to receive attorney fees should it prevail, then the opposing party is likewise entitled to fees if it prevails. *Rowe v. Klein*, 2 Wn. App. 2d 326, 342 n.2, 409 P.3d 1152 (2018). As explained above, Washington courts have applied this doctrine to allow a prevailing party to collect attorney fees authorized under a contract or statute even though that party prevailed by establishing the invalidity of that contract or statute. *Fairway Estates Ass'n of Apt. Owners v. Unknown Heirs*, 172 Wn. App. 168, 182, 289 P.3d 675 (2012). Under this equitable doctrine, the trial court determines whether to award attorney fees by looking to the terms of the contract. *Kaintz*, 147 Wn. App. at 789-90.

Here, mutuality of remedy does not apply because, again, Gervais, Hamilton, and Heritage Bank are not parties to the lease agreement – they are not entitled to fees. Mutuality of remedy would operate much as RCW 4.84.330 does: to make the unilateral fee provision bilateral. But just as RCW 4.84.330 is immaterial to the question of whether they are parties, mutuality of

14

remedy is also immaterial. Absent being parties to the lease, Hamilton and Heritage Bank have no basis for a mutuality of remedy argument. Therefore, to the extent that the parties request an extension of the doctrine to allow a nonparty to a contract to receive attorney fees from another nonparty, we decline their invitation to do so because it reaches far beyond the recognized bounds of the doctrine.

Therefore, we hold there was no legal basis for the trial court to award attorney fees and costs to Hamilton or Heritage Bank. Accordingly, we reverse.

II. ATTORNEY FEES ON APPEAL

Hamilton requests attorney fees and costs on appeal pursuant to RAP 18.1 and RCW 4.84.330. Heritage Bank also requests attorney fees on appeal pursuant to RAP 18.1, RCW 4.84.330, and the doctrine of mutuality of remedy.

RAP 18.1(a) authorizes a party to recover reasonable attorney fees and expenses so long as the party "request[s] the fees or expenses" and "applicable law grants to [the] party the right to recover." The party must do so in a separate section of their opening brief. RAP 18.1(b).

As explained above, the trial court erred by awarding attorney fees and costs based on paragraph 20 of the lease agreement and RCW 4.84.330 because Gervais, Hamilton, and Heritage Bank are not parties to that agreement. Because Hamilton and Heritage Bank were not entitled to attorney fees and costs below, we deny their request for attorney fees and costs on appeal.

CONCLUSION

We reverse the trial court's order granting attorney fees and costs to Hamilton and Heritage Bank.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Veljacic, J.

We concur:

_____
Lee, P.J.

_____
Price, J.